UNITED STATES of America for the Use and Benefit of INDUSTRIAL INSTRUMENT CORPORATION, Plaintiff,

v.

PAUL HARDEMAN, INC. et al., Defendants.

Civ. A. No. 2037.

United States District Court
N. D. Texas,
Abilene Division.

Jan. 8, 1962.

As Amended Feb. 6, 1962.

Gibson R. Randle and Howell Finch, O'Quinn, McDaniel & Randle, Austin, Tex., Vinson, Elkins, Weems & Searls, by Dave McNeill, Jr., Houston, Tex., for use-plaintiff.

John B. Pope, Abilene, Tex., Schwartz & Sandler, by Arnold M. Schwartz, Los Angeles, Cal., for defendants Paul Hardeman, Inc., and Aetna Casualty & Surety Co.

James W. Wilson, Tom Reavley, and Robert C. McGinnis, Powell, Rauhut, McGinnis, Reavley & Lochridge, Austin, Tex., Wolf, Block, Schorr & Solis-Cohen, Philadelphia, for defendant CompuDyne Corp.

FISHER, District Judge.

This is a Miller Act suit in which the Use-Plaintiff Industrial Instrument Corporation (IIC), a supplier of equipment under Atlas missile contracts, brings suit against the general contractor, Paul Hardeman, Inc., its surety on the Miller Act payment bond, Aetna Casualty and Surety Company, and the sub-contractor with whom IIC had a direct contractual relationship, CompuDyne Corporation. The dispute arose out of CompuDyne's termination on September 21, 1960 of its contract covering the purchase from IIC of certain instruments for Atlas missile systems.

IIC contends that the termination was wrongful and seeks to recover $124,098.89 in damages and $25,000.00 in attorneys' fees. These damages are alleged to consist of $26,064.87 for unpaid shipments against sight drafts on August 19, and 31, 1960, $80,044.70 as the value of work performed by IIC for which IIC had not been paid as of the date of termination, $15,000.00 for overtime labor, $1,161.51 for "telegrams, travel expenses and other out-of-pocket extra expenses", and $1,-

827.76 in freight and storage charges. Hardeman, Aetna, and CompuDyne all answered IIC's complaint denying liability, and in addition, CompuDyne has counterclaimed and seeks approximately $88,000.00 in damages. CompuDyne's damages are alleged to consist of $34,-840.79 paid to IIC, $31,571.00 for the difference between IIC's contract and the cost of obtaining substitute goods, and approximately $22,000.00 in expenses incurred in obtaining substitute goods and replacing IIC's equipment with the substitute equipment.

█ CompuDyne, Hardeman and Aetna, and IIC have all moved for summary judgment and the motions of CompuDyne and IIC both raise the question of whether IIC was legally justified in insisting on the payment of sight drafts as a condition to delivery of equipment under the contract. CompuDyne contends that such shipments constituted a material breach giving CompuDyne the right to cancel the contract, obtain substitute goods and recover damages. IIC contends that it received adverse credit information after the contract was entered into which justified IIC's insistence on payment of sight drafts prior to delivery.

The Court is of the opinion that the undisputed facts show that IIC's conduct was not legally justified under the circumstances and that CompuDyne was justified in cancelling and obtaining substitute goods. Therefore, summary judgment will be rendered for the Defendants and denied as to the Use-Plaintiff Industrial Instrument Corporation. Judgment will be rendered dismissing Industrial Instrument Corporation's claim as against all defendants, but the Court does not rule on the question of liability and damages sought by Defendant CompuDyne Corporation against Use-Plaintiff Industrial Instrument Corporation. A trial on the merits is necessary on these issues

Most of the material facts are without dispute, but for the purpose of this summary judgment, the contentions of IIC on all disputed facts will be taken as true even though disputed by the Defendants. Under this view of the record, the Court makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT.

1. On February 29, 1960, the Defendant Paul Hardeman, Inc. entered into seven contracts with the United States Government to furnish and install propellant loading system prefabs and interconnecting piping for Atlas ballistic missile operational and test facilities. These seven contracts were let by the U. S. Army Corps of Engineers, Fort Worth District, and were numbered DA–41–443–eng.–5759 through 5765. Each of the seven contracts covered the furnishing and installing of an identical system at a different Atlas missile installation and were covered by identical specifications.

2. By purchase order dated March 12, 1960, the defendant Paul Hardeman, Inc. and CompuDyne entered into a contract whereby CompuDyne agreed to furnish all instrument panels and prefab mounted instruments included in Section 4 (Process Control Equipment) of the specifications. By letter agreement dated March 11, 1960, CompuDyne and IIC in turn entered into a contract whereby IIC agreed to furnish all the liquid level indicators and float switches under CompuDyne's contract with Hardeman.

3. The principal provisions of this letter agreement between the parties with reference to this dispute are as follows:

"4. *Delivery Date* * * * Time is of the essence because of our time commitment to the prime contractor. You will assume any loss we sustain or costs imposed upon us as the result of your failure to meet the foregoing schedule, including without limitation any sums for which we may be liable as liquidated damages. In the event that you fail to make progress so as to endanger performance of this contract in accordance with its terms, or fail to meet any of the scheduled delivery dates, CompuDyne also reserves the right to ter-

minate the whole or any part of this contract, and assess you for any loss or damage which CompuDyne may suffer as the result of such termination.

"5. *Invoices and Payment.* \* \* Your invoices should be submitted to us on a monthly basis for equipment shipped during the previous month in accordance with the specifications and terms of this contract. Compu-Dyne will make payment of the amount invoiced by you for such equipment, provided that it has been inspected and approved by the Corps of Engineers.

"8. *No Prior Representations* \* \* \* No verbal agreement or conversation with us, either before or after the execution of this contract, will affect or modify any of the terms or obligations herein.

"You will not be entitled to any payment for extra work performed in connection with the work provided for herein, unless such work will have been authorized in writing by us before it is performed.

"13. *Disputes.* In the event of any dispute relating to the conformance of the item to be furnished by you hereunder to the government specifications applicable thereto, the decision of the government's Contracting Officer shall be final and conclusive.

"16. *Inspection.* All material, workmanship, or services entering into the performance of this agreement will be subject to CDC (Compu-Dyne) and government inspection and test at all times before, during, or after manufacture. You will furnish, without additional charge, all reasonable facilities and assistance for the safe, convenient inspections and tests required by the inspectors. Final inspection and acceptance will be at job site. We will have the right to reject and return at your expense, or, in our discretion, to require the correction or replacement of materials, workmanship or services which are defective or do not conform to the requirements of this agreement. All rejects will be held at your risk and expense, including all transportation and handling costs, until returned to or corrected by you.

"19. *Changes.* We will have the right to make, from time-to-time and without notice to any sureties or assignees, changes as to packing, testing, destination, specification, designs and delivery schedule. You will immediately notify us of any increases or decreases in costs caused by such changes and an equitable adjustment in prices or other terms hereof will be agreed upon in a written amendment to this agreement.

"21. *Contract.* This agreement will be governed by the laws of Pennsylvania."

4. The original contract between IIC and CompuDyne was in the amount of $65,000.00 for 55 of each of 5 instruments—four liquid level indicators (LLI–1, LLI–2, LLI–220, LLI–221) and one float switch (FS–9). On June 1, 1960, pursuant to a change order by the Army Corps of Engineers, 55 of an additional type of float switch (FS–10) were ordered by CompuDyne, and on July 12, 1960, pursuant to another change order an additional 20 sets of all 6 instruments were ordered. In addition, IIC contends that during the course of the job numerous changes, extras and additions were made for which it is entitled to additional compensation. CompuDyne concedes that some changes were made but strongly disputes most of IIC's claims for extras. These claims for extras are substantial and amount to approximately $40,000.00, not including the addition of the FS–10 float switch or the increase in the order from 55 to 75 sets.

5. IIC and CompuDyne had another contract during the period in question under which IIC was to furnish similar instruments for a Titan missile project. CompuDyne was the general contractor on the Titan contract in approximately

the same position as Hardeman on the Atlas contract. The payment provisions in the contract between IIC and Compu-Dyne on the Titan project were essentially the same as on the Atlas contract, except that in the Titan contract provision was made for retainage of 10% of IIC's invoices until conpletion of the work and acceptance by the Corps of Engineers. The Titan contract is not involved here even though IIC shipped against sight drafts on the Titan as well as the Atlas contract. CompuDyne paid the sight drafts on the Titan contract when it terminated the Atlas contract stating to IIC that it did so because it could not obtain substitute equipment on the Titan contract.

6. On May 16, 1960, IIC shipped one liquid level indicator housing to Compu-Dyne to be used for mock-up and mounting purposes under the Atlas contract and on June 20, 1960, IIC made its first shipment of instruments on the Atlas contract. This shipment consisted of one FS–9 and one FS–10 float switch and IIC invoiced CompuDyne for $175.00. At a meeting with the Corps of Engineers in Fort Worth on July 6, 1960, a question was raised as to whether these instruments met specifications, and IIC agreed that they would be returned to IIC. Because of this, CompuDyne returned the invoice on this shipment unpaid on July 15, 1960. Three additional small shipments under the Atlas contract were made in July—one on July 11, 1960 in the amount of $350.00, one on July 12, 1960 in the amount of $606.00 and one on July 16, 1960 in the amount of $506.00.

7. On August 4, 1960, IIC made its first substantial shipment of instruments on the Atlas contract, and this shipment was made with instructions to the carrier to make delivery to CompuDyne only on surrender of the bill of lading covering the shipments. The bill of lading itself was sent by IIC to a Philadelphia bank attached to a sight draft on CompuDyne in the amount of $34,840.79, with instructions to the bank to deliver the bill of lading to CompuDyne only on payment of the sight draft. In other words, de-livery to CompuDyne on the instruments was conditioned on the payment of the sight draft. This $34,840.79 sight draft included not only the contract price on the instruments included in the order, but the amount of IIC's claims for extras on these instruments, the amount of the invoices on the previous small shipments and an additional $5.39 which apparently resulted from an error. These shipments against sight drafts were the principal reason for the dispute here. On July 29 and August 1, IIC also shipped instruments on the Titan contract under the same conditions which required the payment of the sight drafts before delivery would be made. These sight drafts on the Titan contract were in the amount of $43,065.00.

8. In support of its motion for summary judgment, IIC submitted affidavits stating in effect that these instruments were shipped against sight drafts because of unfavorable credit information IIC had received about CompuDyne. Though CompuDyne disputes these affidavits in many material parts, they will be taken as true for the purposes of this motion for summary judgment.

9. Commencing in June, 1960, IIC began to receive reports of unfavorable credit information concerning Compu-Dyne. Because of these reports, on July 12, 1960 IIC asked Dun & Bradstreet for further credit information on Compu-Dyne and received an Analytical Report dated July 14, 1960, showing a change of credit rating from A1 to A1½, that CompuDyne's working capital was fully stretched out, and that suppliers were experiencing delays in payment. The summary contained in this Dun & Brad-street Report is as follows: "VOLUME AND EARNINGS INCREASING. PROCESSING OF LARGE GOVERN-MENT CONTRACT HAS CAUSED A TEMPORARY OVER-CENTERING OF WORKING CAPITAL IN RECEIVA-BLES AND INVENTORIES. IN ADDITION TO RETAINED EARNINGS, THE COMPANY IS ENGAGED IN A PROGRAM OF GROWTH THROUGH THE ISSUANCE OF ADDITIONAL

CAPITAL STOCK IN EXCHANGE FOR COMPANIES AND PRODUCTS OF ALLIED LINES."

10. After receiving this report IIC contacted a number of CompuDyne's suppliers and was advised by them that they were experiencing substantial delays in receiving payment. Also, one of IIC's employees personally checked CompuDyne's credit in Philadelphia and was advised that CompuDyne had changed banking connections, that it was in an extremely extended financial condition, and that IIC should check closely before extending substantial credit to CompuDyne.

11. The only notice IIC gave CompuDyne that it was mailing shipments against sight drafts which made no mention of any adverse credit information was IIC's letter of August 8, 1960 reading as follows:

"Attached are our invoices covering two shipments made against your purchase order 003004x4. The sight draft, invoices, and original bills of lading have been forwarded to the Philadelphia National Bank in Hatboro, Pennsylvania for collection.

"Your early handling will be appreciated."

12. Thus, early in August, IIC had over $75,000.00 in shipments in its carrier's hands at point of delivery with instructions not to deliver until sight drafts were paid. CompuDyne's Secretary-Treasurer, Mr. Walter, talked to IIC's Sales Manager, Mr. Ewell, about these sight drafts several times early in August and attempted to prevail upon IIC to lift the sight drafts. IIC was told that CompuDyne was not going to pay the sight drafts and that it was not in a financial position to do so. Hardeman's project manager on the Atlas contract also tried to prevail upon IIC to lift the sight drafts and even offered to guarantee payment, but IIC refused to do so.

13. Because these instruments were badly needed on Hardeman's general contract, when it was apparent that IIC would not lift the sight drafts, Hardeman insisted that the sight drafts be paid in order to obtain delivery of the instruments and advanced the funds to pay them. Accordingly, on August 17, 1960 the first sight draft on the Atlas contract was paid, and CompuDyne obtained delivery of the instruments. Hardeman advised IIC that it had advanced the funds to pay this sight draft, but that it would not do so on future shipments. The $43,065 in sight drafts on the Titan contract still remained unpaid.

14. On August 19, 1960, IIC made another shipment on the Atlas contract against sight drafts in the amount of $15,536.67. CompuDyne refused to pay the drafts, and they have never been paid. On August 26, 1960, IIC wrote CompuDyne the following letter about the sight drafts and again no mention is made of adverse credit information:

"We are advised by the Philadelphia National Bank, Hatboro, Pennsylvania that your company has instructed them to return sight drafts covering shipments made against the above numbered orders.

"On receipt of the above information, our management has issued instructions to suspend production of these orders immediately. Our position in this matter is that we have invested considerable sums of money in materials and prepaid labor over a long period of time and if our drafts covering shipments made are not paid we cannot find reason to continue production.

"The materials to complete these orders are in our plant, completely machined and partially assembled. Production will not be resumed until our drafts have been paid and we have assurance that future drafts, covering shipments made, will be paid promptly.

"Since we have not heard from you, other than your two requests for release of these shipments without payment, we find this situation to be most disturbing and must in-

sist that you make immediate payment of our drafts."

On August 31, 1960, IIC made an additional shipment on an Atlas contract against a sight draft in the amount of $10,528.20.

15. On September 8, 1960 CompuDyne's Purchasing Agent, Mr. Kreig, telephoned IIC's President, Mr. Reese, and made an appointment to go to IIC's plant in Austin, Texas, and this appointment was confirmed by telegram on the same day. The meeting in Austin on September 9, accomplished nothing. CompuDyne insisted that IIC was not due payment until after the instruments are inspected and approved at the job site, that is, Hardeman's plant where the complete propellant loading systems were assembled. IIC refused to release any goods to CompuDyne unless the sight drafts accompanying the shipments were paid. Though disputed by CompuDyne, IIC contends that CompuDyne's Mr. Kreig stated at this meeting that he could not make any payment commitment for CompuDyne, that he would give no assurance that the instruments would be paid within a certain time after receipt of invoices and that CompuDyne was without funds at the time to pay the sight drafts.

16. At about the time of the visit of CompuDyne's Purchasing Agent to Austin, IIC received additional reports from Dun & Bradstreet on CompuDyne stating that CompuDyne's payment record had tended toward increased slowness with most suppliers being paid 75 days beyond terms, and that CompuDyne's management did not see any immediate loosening of the situation.

17. Matters were at a complete impasse, and on September 12, 1960 CompuDyne telegraphed IIC notifying IIC that unless it made delivery as required by the contract its contract would be terminated. This telegram reads as follows:

"Unless you furnish material in accordance with terms of contracts within 48 hours, some of which material is long overdue already, we will cancel your contracts and engage others to furnish material, and hold you responsible for any damages or losses we may suffer including, but not limited to, any difference in price we have to pay elsewhere for material which you are required to furnish and liquidated damages. Such cancellation may involve also rejection of that material for which you have already received payment, and over payment which we do not waive. Re your telegram of 9/12/60 as we have told you consistently, and as you know, the contracts you signed provide in Paragraph 5 and 16 that no payment is to be made until after inspection and acceptance of your merchandise at the job site. In addition, contract 912034x5 provides for 90 per cent payment only, even after inspection and acceptance at job site, until completion of your entire contract. The only possible cause for any delay in your receiving payment has been as a result of your failure to comply with terms of contract."

18. IIC's reply of September 13, 1960 made clear IIC's intention not to release the instruments except on payment of the sight drafts. This telegram contains the first mention of any credit information and reads as follows:

"Retel: All material your 912034x5 is at jobsite therefore the contract is completed justifying 100% payment per paragraph 5. Material shipped on your order 003004x4 is at Lansdale subject to your payment of draft and is in accordance with Paragraph 5. Paragraph 16 is a matter of warranty and nothing more. All items accepted by the Corp and your inspector before, during, and after manufacturing prior to shipment. Further all material to complete this contract is in our plant either assembled or ready to be assembled and will be assembled only on payment of drafts covering materials already shipped. Therefore

we have complied with these contracts in their entirety and will hold you fully responsible for your failure to make payment of same as well as the balance due us on contract. We have not over charged you on a single item and feel that it is a late date for such a misstatement of fact to be injected in this matter. Further be advised your Mr. Walters stated that CompuDyne does not have the money to pay these invoices. We were further advised by Mr. Lawler of Paul Hardeman, Inc., that Hardeman loaned Compu-Dyne the money to pay the only draft paid to date. We accepted this job and all responsibility of financing the manufacture of same without any help or assistance from CompuDyne and have now and have had in excess of $100,000 tied up for many months with delays on top of delays caused by you. These delays materially increased our manufacturing costs far above normal. Now we find CompuDyne not in a position to accept small payments of drafts for materials delivered to them at prices quoted. It is alarming to us that you have asked us to finance your part of the job, since you admittedly do not have the finances to handle your contract. Dun & Bradstreet's report shows that you are over extended with a tight money position and most suppliers are having to wait seventy-five days and longer beyond terms for payment. Report also states that your management sees no loosening up of the situation. In view of this we cannot and will not release the material without payment. You will be held responsible for the entire contract and all revisions authorized by you as well as liabilities caused by further delays."

19. On September 14 CompuDyne telegraphed IIC again, warning that negotiations were under way with an alternate supplier and that unless the instruments were released before these negotiations were concluded, IIC's contracts would be cancelled. The telegram reads as follows:

"Re contracts 912034x5 and 003004x4. In view of the position you have taken, it is pointless to debate the matter further. We are negotiating with another supplier to furnish the equipment you were to furnish under the contracts, and if these negotiations are concluded before you release the material, you will receive termination notice from us.

"As last effort to resolve differences amicably and satisfy your unjustified concern about receiving payments promptly from us, and without prejudice to our legal rights in the event of litigation, we will guarantee to pay for material within 30 days from the date on which you release material to us, and within 30 days from receipt of material delivered hereafter at contract price. We also will negotiate extra charges you have submitted beyond contract price and pay for any such negotiated extras within 30 days after agreement on them is reached.

"The foregoing is last and substantial offer of compromise, since Paragraph 5 does not require us to pay for material until after inspection and approval, both of which terms are defined in Para. 16 as taking place after delivery at job site. Moreover, your insistence on payment by sight draft further violates Para 5 of contract 912034x5 since you are only entitled to 90 percent even after inspection and acceptance until after completion of the entire contract and acceptance of it by the Corps of Engineers. The reason you gave for ignoring terms of contract, that your Board of Directors now insists upon payment of delivery under all missile contracts, is no excuse and should have been raised before you signed the contracts. Further, you know our contract terms on payment are standard in our industry, and

that we would not have contracted with you unless such terms were in the contract, since we are not paid for your, or any other suppliers materials until they are inspected and accepted at job site. Concerning payments made to you on sight draft, we told you it was not made voluntarily, but only because your material was overdue and our contractor and the government had urgent need for it. Accordingly, we paid once to minimize any possible damages which might have resulted from your breach. When paying we assumed charges were in accordance with contract. A review of your charges revealed overcharges for pneumatic relays which you clearly are required to furnish under Section 4.06(B)2 under item 'P' and for protective tubing of certain items under FS–9 and FS–10 which you acknowledged as being necessary in order to meet specs and to make design adequate.

"Finally to make our position unmistakably clear, it was and still is your failure to comply with terms of contracts which have delayed job, and which has been the real cause for your failure to have received payments heretofore.

"The compromise we have proposed herein, rather than insistence on our legal rights, will unquestionably enable you to receive payment at the earliest possible time under all circumstances. This offer is outstanding only until negotiations are concluded with alternate suppliers, which offer will be withdrawn upon receipt by you of termination notice from us."

20. In its reply of September 15, 1960 IIC stated that it would not accept cancellation and continued its insistence on payment of sight drafts before instruments would be released. This telegram reads as follows:

"Re contracts 912034x5 and 003004x4 should CompuDyne terminate on any excuse CompuDyne will be held liable for full amount of contract plus revisions and other costs. Contract 912034x5 complete and shipped per Paragraph 5. We are due 100% payment. Contract 003004x4 makes no provisions for partial payments or delayed payments until completion of your contract nor does it state terms of payment. No negotiations are necesary on charges for additions because all were authorized by CompuDyne prior to fabrication which fact can be substantiated. At time your contracts accepted CompuDyne's credit reports justified open billing. Subsequent reports justify our reversal of your credit classification. Any delays in shipping schedule lay solely on CompuDyne. To date, we have not received from CompuDyne any approved or rejected prints, specifications or change orders on your 003004x4 protective tubing on FS–9 and FS–10 not required by specifications authorized by your Zeuner and Hardeman's Wilson for transportation protections. Exception taken to pneumatic relay by us acknowledge by your Croyle and Zeuner. I. I. C. was authorized to furnish pneumatic relay by Zeuner at additional charge. All terms of contracts have been fulfilled by us including delivery. Cannot find stipulation in contract that instruments must be billed by you to Corp of Engineers and remittance received by you from Corp prior to your payment of our invoices for materials shipped. Your assurance of thirty day payment not substantiated by credit reports or conversations with Walters and comes at a late date. No material will be released except by payment of drafts. Should we receive termination notice from you, immediate action will be taken."

21. Finally, on September 21, 1960, CompuDyne telgraphed IIC that the contract was cancelled and followed the tele-

gram with a letter of the same date reading as follows:

"We wish to set forth clearly our reasons for having cancelled and terminated contract 003004x4 dated March 11, 1960, and any additions to it including those ordered on July 12, 1960.

"In addition to your violations concerning terms of payment and over payments which you insisted we make before you furnished material, and the overpricing in your acknowledgment of August 29 of units covered by the original contract, we discovered on inspection and examination of your equipment that it did not contain the torque tube drives required by the specs, and which your drawings (which you sent us for approval by the government) indicated would be furnished.

"As we advised, you will be held strictly accountable for any and all damages we may incur as a result of your violations which have required us to terminate the foregoing contract. We suggest you take whatever steps you deem appropriate to remove the materials you shipped on sight draft which still remain with the carriers.

"It is now apparent that one of the real reasons you refused to comply with the contract provisions, but instead had us pay for your equipment before it was exposed to inspection and acceptance, was because you knew it could never pass inspection without the torque tube drives.

"We have been unable to procure from another vendor the material you were to supply under contract 912034x5 within a reasonable period of time. Since you have refused to furnish it unless we pay for it in advance (despite the contract provisions to the contrary), we had no alternative but to take the material under these conditions, since we are particularly mindful of our obligation to the Country's security and national defense. However, we have done so involuntarily, under protest and duress, and for the purpose of minimizing damages. We waive none of our rights under the contract by doing so, and you will be held strictly accountable for any and all damage we may incur as a result of your violations. Nor do we waive inspection, approval or acceptance, and you will be held accountable for defects discovered in this equipment."

CompuDyne paid the $43,065.00 sight drafts on Titan contract and took delivery.

22. On September 24, 1960, IIC replied to CompuDyne's letter of September 21 as follows:

"This will acknowledge your letter of September 21, 1960, in regards to your purchase order number 003004x4. This will confirm our telegram of September 22, 1960, addressed to Mr. C. D. Close that we will not accept cancellation of this purchase order or any additions authorized by CompuDyne.

"We have in no way violated the terms of this purchase order in regards to terms of payment nor have we over charged you for any items covered by this purchase order. All additional charges were for changes authorized by CompuDyne. These charges were very reasonable and in all probability are 50% less than would be charged by other manufacturers for similar changes.

"As before stated our reason for shipping instruments against this order sight draft is based solely on credit information furnished us by your Mr. Walters and others and your failure to arrange for terms as outlined by your Mr. Walters prior to the shipment of this material.

"At the time we were advised of the change order issued covering range changes for these instruments, it was determined our Model 800-6

would not be suitable for this application. We notified your Mr. Zeuner and Mr. Sheelar of the Corp that we would furnish our Model 400–6 for this application and secured their approval for the change. It was further discussed that the non-freezing bearing would lend to a more sensitive and responsive measurement of this small unit since this unit does not have the power of the larger Model 800–6.

"Instrument number LLI–1 was supplied with a non-freezing bearing rather than a troque tube with the full knowledge and agreement of your Mr. Walter Zeuner and the Corps Inspectors were all aware of this substitution as the instruments were assembled. Instruments LLI–2 and LLI–220, and LLI–221 are furnished with a torque tube. A further check of our records indicates that all DD 250's were noted to the fact the LLI–1 was supplied with a non-freezing bearing rather than a torque tube. As a matter of information our manufacturing cost of the non-freezing bearing is approximately three times that of the torque tube. However, as stated to your Mr. Zeuner, we agreed to absorb this cost in the interest of furnishing a superior instrument for this application.

"It is a long established fact that industry requiring an accurate differential pressure measurement specified the non-freezing bearing for its superior ability to transmit motion freely and accurately to the recording or indicating device. However, should you desire we will change the LLI–1 from the non-freezing bearing to a torque tube drive. This change does not present a problem and can be made in a very short length of time.

"We might add that the FS–9 and FS–10 both incorporate the non-freezing bearing and have been approved by the Corp and certified explosion proof by an independent laboratory.

"It is and has been apparent that all questions raised by CompuDyne in regards to the manufacture, specifications, changes and charges were and are raised solely for the purpose of securing release of the instruments shipped you without payment of our drafts and to insure future shipments on open account. At the offset your Mr. Walters frankly stated your firm did not have the funds to pay our drafts and that it would be necessary for him to receive the material open account, invoice your customer and on receipt of payment by your customer to CompuDyne then he in turn could pay us. As before stated we do not feel obligated to further finance these instruments for the benefit of CompuDyne.

"We have in our plant all of the materials to complete this order and its additions. This material is all machined and partially assembled and represents a considerable investment both in material and prepaid labor. Further, this material was purchased for the express purpose of filling your order.

"Be assured that we will take immediate legal action to protect our investment should you persist in your cancellation efforts.

"Your comments in regards to the foregoing will be appreciated."

23. On November 14, 1960, almost two months after termination, IIC tendered delivery of the August 19 and August 31 shipments without requiring payment of the sight drafts. However, by this time CompuDyne had obtained substitute instruments and refused to accept delivery.

24. IIC did not make a specific or written demand of CompuDyne for information of good credit rating and CompuDyne did not furnish information to IIC which would tend in any way to disprove the credit information received by IIC.

134

## CONCLUSIONS OF LAW.

1. The Court has jurisdiction of the parties and the subject matter under the Miller Act, 40 U.S.C. §§ 270a–270e, 40 U.S.C.A. §§ 270a–270e.

█ 2. All substantive questions of law are controlled by Pennsylvania law. The contract is one for the sale of goods, and under Pennsylvania law such contracts are governed by the Uniform Commercial Code, Title 12A, Purdon's Pennsylvania Statutes, Annotated.

3. The contract between IIC and CompuDyne calls for a sale on credit and IIC's action in shipping goods on bills of lading attached to sight drafts and insisting on payment of such sight drafts as a condition of delivery was a suspension of performance under its contract with CompuDyne and CompuDyne was justified in not honoring the sight drafts and in giving notice of cancellation of said contract and obtaining substitute goods.

4. The Uniform Commercial Code provides no legal justification for IIC's shipping goods on bills of lading attached to sight drafts and insisting on payment of such sight drafts as a condition of delivery, contrary to the credit and terms of said contract.

5. Because of IIC's suspension of performance under its contract with CompuDyne by shipping goods on sight drafts, CompuDyne was justified in cancelling the contract and obtaining substitute goods.

6. By IIC's voluntary action in suspension of performance under its contract with CompuDyne by insisting on sight-draft delivery, the Use-Plaintiff, Industrial Instrument Corporation materially varied and changed the terms of the contract and therefore, lost all rights and protection it had under and by reason of the Miller Act and all claims which it might otherwise have had against the Defendants, CompuDyne Corporation, Paul Hardeman, Inc. and Aetna Casualty & Surety Company.

THEREFORE, the motions for summary judgment of the Defendants are granted and that of the Use-Plaintiff is denied. Let Judgment be entered accordingly.